MARTHA B. STEVENS, appellant,

and

W. W. SHIPPEN and others, respondents.

1. In case of an executory contract to build a vessel, to be paid for in installments as the work progresses, the title remains in the builder until the work is completed, and the rule is the same where the vessel is built under the inspection of a superintendent appointed by the purchaser.

2. The title to the vessel known as the "Stevens Battery" (under the contract between Robert L. Stevens and the United States government), was vested in Robert L. Stevens at the time of his death, and, under his will, passed to Edwin A. Stevens, his residuary legatee.

On appeal from a decree of the Chancellor, reported in *Stevens* v. *Shippen*, 1 *Stew.* 487.

*Mr. Joel Parker*, for the state.

*Mr. Walter L. Clarkson* and *Mr. F. W. Stevens*, for the heirs of R. L. Stevens.

Van Syckel, J.

The facts of this case are fully stated in the opinion of the chancellor, reported in 1 *Stew*. 487. The only question raised on this appeal is, whether, under the resolution of congress, approved by the president July 17th, 1862, which, by its terms, released and conveyed the unfinished vessel known as the "Stevens Battery," to the "heirs at law of Robert L. Stevens, deceased, or their legal representatives," the title to that vessel passed to those heirs at law, or to Edwin A. Stevens as the residuary legatee of Robert L. Stevens?

On the 10th of February, 1843, Robert L. Stevens entered into a contract with Mr. Upshur, then secretary of the navy, for the construction of a war steamer for the United States government, for harbor defence, shot-and-shell-proof; to be built principally of iron, upon a plan devised by Mr. Stevens. The vessel was to be built for a stipulated price, according to plans and specifications agreed upon, and to be completed within two years. Under this original contract, there could be no doubt that the legal title to the vessel remained in Mr. Stevens until it was completed and delivered to, and accepted by, the government.

On the 14th day of November, 1844, a second contract, explanatory of the first contract, was entered into between Mr. Stevens and Mr. Mason, who had succeeded Mr. Upshur as secretary of the navy. After reciting the contract of February 10th, 1843, it was agreed that it should be modified and explained as follows : The time for the completion and delivery of the vessel was extended two years from the date of the explanatory agreement; the specifications were in some respects altered, and the manner in which the vessel was to be equipped more definitely stated.

It was further stipulated and agreed that the secretary of the navy should appoint, and that Mr. Stevens should admit within his establishment for building said war, steamer, some person or persons whose duty it should be to attend at the works of the said Stevens, and to receive and receipt for, on account of the navy department, all materials, of every description, which should be delivered for constructing said war steamer, her engines and dependencies; which materials, when so received and receipted for, should be distinctly marked with the letters " U. S.," and should become the property of, and belong to, the United States; that the said Stevens's bills for labor and unwrought materials (already or thereafter to be rendered) should be certified for payment with the customary percentage of addition, and that the authority of the inspecting officer should not be understood to extend to the right to judge of the quality or fitness of the said materials, or the workmanship of any part of them, but merely to the cost of the same; that the navy department should pay to said Stevens, as the price of the said war steamer, when fully completed and delivered in conformity with the provisions of this contract, the sum of $586,717.84; that, as security for the faithful performance of his contract, the said Stevens should execute to the United States a mortgage upon certain specified real estate in Hoboken, with ample power to enter upon and sell the same in case of failure on his part to perform the contract; that, after bills certified to the amount of $500,000 had been paid to Mr. Stevens, the balance of the contract price, if it was deemed necessary for the security of the government, should be withheld, as further security for the execution of the contract by Mr. Stevens, and, in addition to the said mortgage security, that, when the vessel should be fully completed in all respects, and duly delivered to and received by the agent of the United States, according to the terms of the contract, the balance of the contract price should be paid to Mr. Stevens, and his mortgage surrendered to him for cancellation.

Mr. Stevens executed the mortgage called for by the contract, proceeded with the work upon the vessel, and, in 1856, before its completion, he died.

In 1849, the government, having advanced $500,000 of the price, refused to make any further payment, and the work was therefore, for a time, suspended, but was again resumed in 1853. At the time of his death, Mr. Stevens had expended upon the vessel, which was then far from completion, over $113,000 of his own money, in addition to the sum of $500,000 received from the United States government. By his will, dated in 1846, he made his brother, Edwin A. Stevens, his residuary legatee, and it is admitted that if the vessel was part of the estate of Robert L. Stevens, it passed, under his will, to his brother Edwin.

The general rule of law, that, under a contract for building an entire vessel, no property vests in the party for whom she is built until she is ready for delivery, and has been accepted and approved by such party, is not controverted. But it is claimed that this case is taken out of the general rule, by the fact that this vessel was constructed under the superintendence of the government; that payments were made upon her as the work progressed; and that, by the terms of the contract, materials for her construction were to be marked with the letters " U. S.," and to be the property of the United States. The case relied upon to support this distinction is *Scudder* v. *Calais Steamboat Co.*, 1 *Cliff.* 370, in which Justice Clifford relies upon the authority of *Woods* v. *Russell*, 5 *B. & Ald.* 942.

In this state, in *Elliott* v. *Edwards*, 6 *Vr.* 265, it has been expressly held, contrary to the rule laid down in *Woods* v. *Russell*, that, in case of an executory contract to build a vessel, to be paid for in installments as the work progresses, the title remains in the builder until the work is completed and delivered. This case was affirmed in our court of last resort (7 *Vr.* 449), and must be accepted as the law of this case.

In *Clarke* v. *Spence*, 4 *Ad. & El.* 448, some importance is attached to the fact that the vessel was to be built under a

superintendent appointed by the purchaser, on the ground that the builder was bound to deliver that particular vessel, and the purchaser was obliged to accept it, and that no other vessel could be delivered in performance of the contract. But the court in that case was constrained to observe, that: " Until, however, the last of the necessary materials be added, the vessel is not complete—the thing contracted for is not in existence—for the contract is for a complete vessel, and not for parts of a vessel; and we have not been able to find any authority for saying that, whilst the thing contracted for is not in existence as a whole, and is incomplete, the general property in such parts of it as are from time to time constructed shall vest in the purchaser, except the above passage in the case of *Woods* v. *Russell.*"

It will be observed that there is a circumstance which distinguishes the case in hand from *Clarke* v. *Spence.* In that case the plan of the vessel was agreed upon, and the superintendent of the purchaser was present to see that proper materials were used and the specifications complied with, and the vessel was to be taken by the purchaser; there was to be no uncertainty in regard to that; while in this case, by the express terms of the agreement, the authority of the inspecting officer was not to extend to a right to judge of the quality or fitness of materials, or of the workmanship of any part of them, but merely as to the cost of the same, and of the labor actually applied to them. The mode in which the vessel was to be constructed to make it shot-proof, was left to the judgment of Mr. Stevens, who, in the language of the chancellor, " was actuated by a desire to embody and illustrate his own ideas of naval architecture for the purposes of warfare." He undertook to build a vessel which should be shot-and-shell-proof against the artillery then in use on board vessels of war, and the government, in the contract, took unusual care to secure itself against the contingency of loss in the event of his ideas proving to be a failure. Taking the whole contract together, it is manifest that the government did not intend to become the

owner of the vessel unless she was a success.  She was not
to be accepted by the government provided she was made to
conform to a certain model, but only in the event that she
should be capable of offering the resistance which the
builder stipulated she should show under fire.  Under the
original contract it was so clear that the title, pending the
construction, would inhere in Mr. Stevens, that the parties,
if any change had been intended in that regard, would have
left no uncertainty about it in the explanatory agreement,
which was drawn with so much care for the public interests.
The mortgage which Mr. Stevens was required to execute
upon very valuable lands as security for the faithful per-
formance of his contract, confirms this view, and the provi-
sion that certain materials should be marked " U. S.," and
become the property of the government, supports rather
than weakens it, for, if the ownership of the vessel itself was
to be transferred, it seems reasonable to presume that the
declaration as to ownership would not have been limited to
the materials.

If it had been the purpose of the explanatory agreement
to vest the title in the government, it is reasonable to sup-
pose that there would have been a clear expression to that
effect, and that neither party would have been content
to leave so important a matter to uncertain inference.
Advances were to be made by the government to Mr.
Stevens, according to the amount of materials furnished for
the work, and, therefore, they were marked " U. S." to
ascertain the progress of the work, so that the government
would not pay faster than the work was done, and, also, to
prevent any misappropriation of such materials, by divert-
ing them to other uses, after the government had advanced
money to the contractor to an amount based upon the value
of such materials.  This was a wise precaution.  The pay-
ments were not understood to have the effect of divesting
Mr. Stevens of the title, because the contract expressly
states that the payments were made in consideration of the
security—that is, the mortgage—given for the faithful exe-

cution of the contract. The reason for making the payments being declared, in the contract, to be in consideration of the security given by Mr. Stevens, no other intention can fairly be imputed to the contracting parties. The idea that the title passed out of the builder, is also excluded by the language of the agreement, "that, when the said Stevens shall have fully completed the said war steamer, and when she shall have been delivered and accepted by the agent of the United States, the balance of the purchase price shall be paid, and the said mortgage surrendered." This language, used repeatedly in the contract, was certainly inapt, if it was understood that the title resided in the government.

The delivery was to be that of a vessel in its complete state, and its acceptance was to be contingent upon its capacity to accomplish what its builder had promised; otherwise the right to reject it was unquestionable. That such was the interpretation put upon this agreement by the government, may be fairly drawn from the history of the transaction. When the work was suspended, in 1849, by reason of the refusal of the secretary of the navy to make any further payments, the vessel was left in the possession of Robert L. Stevens, and, after his death, in the exclusive possession of Edwin A. Stevens. There has never been any attempt on the part of the government to assert any title to the vessel, or to take possession of her. On the contrary, so far as appears, the inspecting officer of the government was withdrawn, and Robert L. Stevens, in his life-time, after 1852, expended, of his own money, over $113,000, and, after Robert's death, Edwin expended over $89,000, in the work of completing the vessel, without any governmental supervision or interference.

I conclude, therefore, both upon the law applicable to the contract, and upon the understanding fairly to be deduced from its terms, and the conduct of the parties to it, that, at the time of Robert L. Stevens's death, the title to this vessel was vested in him. The government had a

right to recover its damages against the estate of Robert L. Stevens for breach of his contract, with power to resort to the collateral mortgage, and, it may be, also to an equitable lien on the vessel, to enforce the payment of the damages recovered.   No construction of the contract more beneficial to the government can be made.

The resolution of congress upon which this controversy arises, must be read with this understanding of the legal rights of the respective parties under the original and explanatory agreements.

Edwin A. Stevens was permitted to remain in the exclusive possession and control of the battery during his lifetime.   He made various proposals, during the late civil war, to complete the vessel for the United States government, which resulted in the appointment of a board of examiners to inspect the vessel, and a report by a majority of them, dated December 24th, 1861, that it was not advisable, on the part of the government, to finish the battery on the plan then proposed by Edwin A. Stevens.

On the 17th of the following July, the joint resolution in question was passed, as follows :

"A resolution releasing to the heirs at law of Robert L. Stevens, deceased, all the right, title and interest of the United States in and to the Stevens Battery.

"*Resolved*, by the senate and house of representatives of the United States of America in congress assembled, That all the right, title and interest of the United States in and to the Stevens Battery be and the same are hereby released and conveyed to the heirs at law of the said Robert L. Stevens, or their legal representatives."

The government could not invest the heirs at law with the title of the vessel, because it had no title itself—it had merely a right of action for damages.   The words of the resolution are not apt to pass a right of action, and if they were, the word " release " would strongly indicate an intention to relieve the person against whom the right of action existed, and not to confer upon another the right to maintain suit against him.

McMillan v. N. Y. Water Proof Paper Co.

From 1849, when further advances were refused, up to 1862, when this joint resolution was passed, no attempt had been made on the part of the government to enforce against Mr. Stevens or his estate its claim for damages, if any rightfully existed, and it is highly improbable that congress would, under the circumstances, have attempted to revive a stale claim and have conferred upon the heirs at law of Robert L. Stevens any right to involve his estate in litigation.    I think that the purpose and effect of the resolution was to surrender any right which the government had to a completion of the battery, and to free Mr. Stevens's estate from all liability to damages for the non-performance of the contract.    The result is, that, under the will of Robert L. Stevens, the title to the battery vested in his residuary legatee.

The decree, so far as appealed from, should be affirmed, with costs.

Decree unanimously affirmed.